IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA

|  |  |
|---|---|
| Morgan Michelle Munson and Christopher Edward Munson, <br><br> Plaintiffs, <br><br> vs. <br><br> Insys Therapeutics, Inc., and Linden Care, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No.: _____

2018-CA-2146

CV-D

## COMPLAINT AND JURY DEMAND

Morgan Michelle Munson and Christopher Edward Munson, by and through their undersigned counsel, and for their Complaint against the above-named Defendants, allege as follows:

### PARTIES

1.     Plaintiffs are citizens and residents of Duval County, Florida. Plaintiffs are bringing the following causes of action: civil conspiracy, pharmaceutical negligence, general negligence, negligent misrepresentation, common law fraud, aiding and abetting, and a claim under the Civil Remedies for Criminal Practices Act.

2.     Defendant Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business and executive offices located at 444 South Ellis Street, Chandler, Arizona 85244. Insys is a pharmaceutical company that manufactures a prescription sublingual fentanyl spray with the brand name Subsys (hereinafter "Subsys"), which is marketed, distributed, prescribed, sold, dispensed, administered, and consumed throughout the United States, including

Florida. At all times relevant hereto, Insys was acting individually and/or through its agents, servants, or employees.

3.      Defendant Linden Care, LLC ("Linden Care") is a New York limited liability company dispensing and distributing prescription drugs to Florida citizens. Linden Care's principal place of business and corporate headquarters are located at 130 Crossways Park Drive, Suite 101, Woodbury, New York. At all times relevant hereto, Linden Care was acting individually and/or through its agents, servants, or employees.

4.      Linden Care is a "concierge pharmacy service" specializing in filling, dispensing, and shipping pain medications throughout the country via mail/commercial shipping services, and Linden Care served as the, or one of the, primary pharmacy dispensers of Subsys for Insys. Linden Care does not operate any physical retail pharmacies in Florida, and its main method of dispensing and shipping Subsys throughout the country (and in Florida) was/is via Federal Express.

5.      At all times relevant hereto, Linden Care was engaged in the practice of pharmacology—an enterprise it accomplished by and through its agents and employees.

6.      Linden Care's agents and employees are obligated to practice pharmacology in accordance with reasonably safe and accepted standards of pharmacology.

7.      The Institute of Pain Management, PA ("IPM") is a Florida professional association operating a medical practice in Jacksonville, Florida.

8.      Dr. Orlando G. Florete ("Dr. Florete") is a physician practicing medicine in Duval County, Florida and is the medical director of IPM.

9.      Dr. Florete practices generally in the areas of physical medicine and pain management and has prescribed Subsys to multiple patients.

2

10.    IPM and Dr. Florete employ medical professionals providing clinical care and specific medical treatment to patients, including Mrs. Munson.  While Mrs. Munson was a patient of IPM, she was treated by and/or prescribed Subsys by Dr. Florete, Dr. Marisol Arcila, Dr. Kenneth Eaddy, Dr. Jody Crisostomo, Dr. Luiz Massa, Dr. Jawed Hussain, and nurse practitioner Shannon Groleau.

11.    Once prescribed, Subsys is delivered to the patient from different pharmacies.  In this case specifically, Linden Care delivered Subsys to Mrs. Munson at her residence in Duval County, Florida via Federal Express.

12.    Insys, Linden Care, IPM, and Dr. Florete have the right or power to direct and control the way their employees and/or agents operate the business of delivering medications, including Subsys, and/or providing health care for a fee through their different entities.

13.    On information and belief, Linden Care employs medical professionals providing clinical guidance on distributing medication to patients.

14.    Defendants' negligent, grossly negligent, reckless, willful, or wanton acts, omissions, and liability includes that of their agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principles of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or respondeat superior.

## VENUE AND JURISDICTION

15.    Venue and jurisdiction are proper in Duval County as the acts below took place therein.

16.    Insys distributes Subsys to patients through doctors "providing" treatment to patients, including Mrs. Munson, who are then prescribed the dangerous drug.

17.    Once Subsys is prescribed by a licensed medical provider, the drug is distributed to the patient by different pharmacies, and in this specific case, by Linden Care.

3

18.    Dr. Florete and all other Subsys-prescribing physicians at IPM ensured Mrs. Munson was prescribed Subsys.

19.    Insys submitted itself to the jurisdiction of this Honorable Court by doing, personally or through its agents, at all times material to this cause of action, the following acts:

    a.  Conducting and engaging in substantial business and other activities in Florida by selling controlled substances, including the fentanyl products at issue, to persons and entities in this state via its distribution network. Such controlled substances were used by consumers in Florida in the ordinary course of commerce and trade;

    b.  Committing a tortious act within this state by recklessly and fraudulently marketing and distributing its controlled substances, including the fentanyl products at issue, to persons and entities in this state. Such controlled substances were used by consumers in Florida in the ordinary course of commerce and trade; and

    c.  Causing injury to persons in Florida, including Plaintiffs. At or about the time Plaintiffs' injuries occurred, Insys was engaged in solicitation activities to promote the sale, consumption, and use of its controlled substances, including the fentanyl products at issue, and such products were consumed within Florida in the ordinary course of commerce, and Insys was engaged in substantial and not isolated activity within this state.

20.    Linden Care submitted itself to the jurisdiction of this Honorable Court by doing, personally or through its agents, at all times material to this cause of action, the following acts:

    a.  Conducting and engaging in substantial business and other activities in Florida by selling controlled substances, including the fentanyl products at issue, to persons and entities in this state via its distribution network. Such controlled substances were used by consumers in Florida in the ordinary course of commerce and trade;

    b.  Committing a tortious act within this state by recklessly and fraudulently marketing and distributing its controlled substances, including the fentanyl products at issue, to persons and entities in this state. Such controlled substances were used by consumers in Florida in the ordinary course of commerce and trade; and

    c.  Causing injury to persons in Florida, including Plaintiffs. At or about the time Plaintiffs' injuries occurred, Linden Care was engaged in solicitation activities to promote the sale, consumption, and use of its controlled substances,

including the fentanyl products at issue, and such products were consumed within Florida in the ordinary course of commerce, and Linden Care was engaged in substantial and not isolated activity within this state.

## GENERAL FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### The Pharmaceutical Drug Subsys

21.     Subsys is a Transmucosal Immediate-Release Fentanyl ("TIRF") and a Schedule II narcotic pursuant to Fla. Stat. § 893.03(2)(b).

22.     Subsys is an extremely dangerous, addictive, and lethal synthetic opioid that is eighty times more powerful than morphine. It is among the most potent opioids available for human consumption.

23.     Subsys is a liquid form of fentanyl and is applied under the tongue, using an application that is called a sublingual spray.

24.     Its effects, while practically indistinguishable from heroin or morphine, have a greater potency and a shorter duration of action. Subsys is rapidly distributed to the brain, heart, lungs, kidneys, and spleen.

### Defendants Knew of Subsys's Inherent Dangers and Its Sole Safe Use

25.     Given its dangerously high potency, Subsys has always had only one medically-appropriate and safe use: the mitigation of breakthrough pain in those suffering from cancer who are otherwise tolerant to opioids.

26.     At all relevant times, the medical literature, studies, and other pertinent medical community knowledge all confirmed that: (1) Subsys, and all other similar Transmucosal Immediate Release Fentanyl ("TIRF") formulations, must only be used for the treatment of breakthrough cancer pain; and (2) the use of Subsys and other similar TIRF formulations for

anything other than breakthrough cancer pain presented an unreasonable risk of addiction, disease, and death for the patient.

27.     Insys, as the manufacturer of Subsys, has always known that Subsys had no medically-appropriate or safe uses beyond the treatment of breakthrough cancer pain.

28.     As experts in their field, Linden Care, Dr. Florete, and all other Subsys-prescribing physicians at IPM were well-aware of the medical literature establishing the dangerous effects of Subsys and all other similar TIRF formulations.

29.     As further evidence of such knowledge, Insys, Linden Care, Dr. Florete, and all other Subsys-prescribing physicians at IPM were required to review Subsys education materials, pass a knowledge assessment, and then certify that he/she understands, *inter alia*, that Subsys is only indicated for "the management of breakthrough pain in cancer patients 18 years of age or older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain," that the initial dosage shall be one hundred micrograms, and any subsequent increase in dosage shall only be in 100 mcg increments.  Linden Care, Dr. Florete, and all other Subsys-prescribing physicians at IPM were required to review such materials and make such certifications in order to be allowed to dispense and/or prescribe TIRF products and become part of the U.S. Food and Drug Administration's "Transmucosal Immediate Release Fentanyl Risk Evaluation and Mitigation Strategy Program" ("TIRF REMS").

30.     To be clear, the preceding paragraph is alleged solely to establish the knowledge possessed by the conspirators involved in this case with respect to the medically-safe use for Subsys and the dangers of prescribing and providing Subsys to patients for any purpose other than the mitigation of breakthrough cancer pain.  Plaintiffs expressly disclaim any cause of action premised on a violation of federal laws or regulations.

### Defendants' Conduct

31.     As discussed more fully herein, Defendants subverted, manipulated, violated, and ultimately ignored all of the medical literature and standards to encourage and facilitate Subsys prescriptions regardless of whether it was appropriate treatment for the individual patient.

32.     On information and belief, Defendants' reason for doing so was purely financial and had nothing to do with the care and safety of patients, specifically including Mrs. Munson.

33.     Insys and Linden Care acted in this manner regularly and systematically across the country.

34.     Since Subsys' approval in 2012, Insys engaged in a systematic, deceptive, and illegal pattern and practice of promoting and selling Subsys.

35.     Specifically, Insys infiltrated the medical community with kickbacks and financial rewards to persuade physicians to prescribe Subsys in exchange for independent financial gain or other enticements, instead of basing those prescribing decisions on individual patients' needs.

36.     Subsys is an expensive drug, and Insys garnered great financial benefit in increasing the number of prescriptions, regardless of any dangerous and deadly consequences that may befall a patient.

37.     In this case, Mrs. Munson was billed more than $10,000 per month for her Subsys prescriptions over more than a three-year period.

38.     In 2012, the first year Subsys was on the market, 4528 Subsys prescriptions were written, resulting in sales of $14 million.

39.     By the end of 2014, Subsys gained a 40.2% share of the TIRF market and became the most prescribed TIRF brand name drug.

40.     By the end of 2015, Subsys prescriptions increased exponentially to 49,063 and sales increased to $426 million—a 3200% increase.

41.     By the end of 2015, over 80% of Subsys prescriptions were likely medically unnecessary and were written for unapproved indications, *i.e.*, persons not suffering from cancer and/or breakthrough cancer pain.

42.     Insys achieved rapid growth through a multitude of false, fraudulent, and misleading tactics including incentivizing the medical community to prescribe Subsys with kickbacks.

43.     Throughout its various market territories, Insys would obtain prescribing records from primary care, pain management, and other physicians (or practitioners) to see who was prescribing opiates for general chronic pain, and then send its sales representatives to those medical providers in many instances, including here, to pay them kickbacks for prescribing Subsys.

44.     As part of its campaign of spreading false and misleading information throughout the medical community about indications for which Subsys could be safely prescribed, and while also misrepresenting the true dangers of the potent drug, Insys developed its "Speakers Program," which consisted of Insys management and sales personnel recruiting and paying physicians to hold seminars and to spread false and misleading information in order to lure unsuspecting physicians into prescribing Subsys for non-cancer general pain.

45.     This "Speakers Program" was false and misleading in many respects.

46.     Insys would pay preferred medical doctors/prescribers thousands of dollars to market Subsys and, upon information and belief, to purportedly inform other medical providers "about the safe and intended use of Subsys."

47.     In actuality, Insys and the medical doctor/prescriber would arrange a dining event for the prescriber and members of his/her staff and/or family, and then falsely populate a roster of physicians who purportedly attended the "program."

48.     This ruse allowed Insys to funnel kickbacks to specific medical providers, including Dr. Florete and other Subsys-prescribing physicians at IPM, who were willing to prescribe Subsys in exchange for financial benefit, all under the guise of conducting a legitimate information session.

49.     Dr. Florete received over $120,000.00 from Insys in a short period of time to be in its "Speakers Program," and Marisol Arcila received over $70,000.00.[1]

50.     Not surprisingly, similar conduct has resulted in criminal charges against Insys founder John Kapoor, M.D., along with numerous Insys executives, Insys sales representatives, and medical providers aligned with Insys.

51.     One criminal actor is Karen Hill, the former Insys Regional Director of sales for the territory that included Florida, who pled guilty in the Southern District of Alabama in July 2017 to conspiring to pay illegal kickbacks to doctors in exchange for them prescribing Subsys.

52.     Specifically, Hill taught other sales representatives that the key to getting doctors to prescribe Subsys was not to sell them on the drug, but to find out what motivated the doctor, whether it be "money, chocolate, or spending time with her."[2]

---

[1] Many, if not all, of Insys' payments to doctors are publicly reviewable at http://OpenPaymentsData.CMS.gov. Information specific to Dr. Florete and Dr. Arcila, including a breakdown of the purported purposes of Insys' payments can be seen and/or reviewed at https://openpaymentsdata.cms.gov/physician/323123/summary and https://openpaymentsdata.cms.gov/physician/270881/summary, respectively.

[2] United States Department of Justice, U.S. Attorney's Office in the Southern District of Alabama: Insys Regional Manager Pleads Guilty to Kickback Conspiracy, https://www.justice.gov/usao-sdal/pr/insys-regional-manager-pleads-guilty-kickback-conspiracy (accessed February 19, 2018).

53.     The FDA and the TIRF-REMS program required Subsys be used at the lowest possible dose to treat a patient's breakthrough cancer pain.

54.     Thus, when prescribed for patients with breakthrough cancer pain—its only approved and medically-supported usage—Subsys should be commenced at 100 mcg and, only if necessary, increased or "titrated" slowly and in 100 mcg increments.

55.     Insys earns more money when a higher dose is prescribed, as do Insys sales representatives, whose compensation is based largely on commissions.

56.     Insys sales representatives earned commissions based on the overall dollar amount of sales rather than units, thus incentivizing its sales force to encourage physicians to prescribe Subsys where not medically necessary, such as for off-label indications at extremely dangerous dosages.

57.     Based on this structure, Insys sales representatives had an economic incentive to recommend a higher dose—typically one that was contrary to the sole medically-supported use.

58.     Insys intentionally encouraged and required its sales representatives to promote starting patients on a high dose of Subsys—between 600 mcg and 1600 mcg—instead of the lowest possible dose necessary to manage the patient's pain, all of which is contrary to the sole medically-supported use.

59.     Insys engaged in this conduct knowing it would result in increased demand for Subsys and accordingly, higher profits, while ignoring the obvious risk posed to patients, including Mrs. Munson.

60.     However, increasing consumption was not enough. Insys had to ensure it received compensation for the increase of Subsys demand it had manufactured and accordingly created an

entire department at its corporate headquarters to obtain approval (and ultimately payment) for Subsys prescriptions.

61.     This department, known as the Insys Reimbursement Center ("IRC"), operated with the sole purpose to gain pre-approval, and ultimately payment, from insurers for Subsys prescriptions for unapproved indications and amounts by misrepresenting diagnoses and misleading insurers.

62.     Insys disguised the identity and location of the IRC often with the guise that the unit was from the prescribing doctor's office.

63.     Prior Authorization Specialists would speak directly with insurance companies and/or Pharmacy Benefits Managers ("PBM") by impersonating someone from the prescriber's office and say whatever it took to ensure payment. For example, if the patient was required to try and demonstrate the ineffectiveness of generic medications before the insurer would reimburse for Subsys, "specialists" would lie about the patient's medication history. Insys "specialists" would also claim that the prescription was a three-month supply when in reality it was only for one month.

64.     On information and belief, on multiple occasions, the IRC blocked its phone number(s) with the intent to mislead insurers and pharmacy benefit managers into believing that the IRC was calling from the prescribing doctor's office.

65.     Insys provided doctors with Insys-generated Prior Authorization forms that Insys would partially pre-populate with information, and the prescribing doctor would then complete with patient specific information.

66.     The Prior Authorization forms would then be sent to the IRC, where its staff would do whatever was necessary to secure pre-approval and payment for Subsys.

67.     If the IRC was unable to obtain approval upon its first submission of the Prior Authorization for Subsys, Insys would provide prospective patients with free product samples.

68.     Upon information and belief, the goal was to get the patient dependent on or addicted to Subsys so that the IRC could later resubmit the prescription for approval and payment citing the patient's prior usage of the drug.

69.     By design, this program implicitly misrepresented to patients, insurers, and even physicians that Subsys was safe and appropriate for innumerable diagnoses and at elevated amounts.

70.     Insys' main partners in executing this scheme during the years 2012-2016 were Linden Care and the physicians like Dr. Florete in the Insys "Speakers Program."

71.     As previously stated, Linden Care received all Subsys education materials and affirmatively represented to having understood those materials.  As a result, Linden Care knew the drug's only medically-supported use was for patients experiencing breakthrough cancer pain, and that only certain specified dosage levels were consistent with that sole medically-supported use.

72.     Upon information and belief, Linden Care willfully ignored the medically-supported dosage instructions, which required a 100-mcg initial dosage and limited increases in dosage using 100 mcg increments.

**Mrs. Munson's Interactions with Defendants and IPM**

73.     Mrs. Munson first became a patient of IPM in 2013 for pain related to arthritis and lupus.

74.     This condition did not warrant treatment with Subsys.

75.     The purpose of Mrs. Munson seeking a doctor/patient relationship with IPM was to manage the various prescription medications she was taking for her various health conditions, *i.e.*,

arthritis and lupus, with the goal of reducing and limiting the need for multiple medications while managing her overall heath.

76.     Mrs. Munson did not have cancer, or pain from cancer.

77.     When Mrs. Munson became a patient of IPM, both the practice and Dr. Florete (and their agents and/or employees) had an obligation and responsibility to conduct thorough psychological and physical assessments to determine the proper treatment.

78.     On information and belief, in prescribing Mrs. Munson Subsys, Dr. Florete, IPM, or their agents and/or employees completed forms and/or documents detailing specific reasons for the prescription, indicating why Mrs. Munson was a proper candidate for Subsys, and determining her ability to withstand Subsys' addictive effects.

79.     During Mrs. Munson's treatment, she was prescribed Subsys and other narcotic medications.

80.     Upon information and belief, despite this "treatment," neither IPM nor Dr. Florete (or their agents or employees) undertook any of the appropriate precautions or necessary predicates for prescribing Mrs. Munson Subsys, which again, is a very dangerous and addictive narcotic.

81.     Mrs. Munson was functional and not debilitated by pain at the time of her initial visit with Dr. Florete.

82.     From 2013 to 2016, Dr. Florete other Subsys-prescribing physicians at IPM made multiple material misrepresentations to Mrs. Munson regarding the safe and legitimate use of Subsys and the serious risks associated with the drug.

83.     Neither Dr. Florete nor other Subsys-prescribing physicians at IPM ever informed Mrs. Munson that Subsys was fentanyl and that it was only approved and indicated for patients experiencing breakthrough cancer pain.

84.   Insys, Linden Care, Dr. Florete, and all other Subsys-prescribing physicians at IPM knew that patients should be titrated appropriately when prescribed Subsys, yet in Mrs. Munson's case, she was initially prescribed 200 mcg, and this initial dosage was later improperly increased to two sprays at 800 mcg, for a total of 1600 mcg.

85.   Linden Care was aware of this inappropriate prescription and the fact that the titration was quick, excessive, and contraindicated.

86.   When Mrs. Munson received a prescription for Subsys, Dr. Florete (or an agent/employee of IPM) would forward the prescription to Linden Care via fax or electronic transmission.

87.   Linden Care would then ship Subsys to Mrs. Munson via Federal Express.

88.   At all times relevant hereto, Linden Care willfully ignored the medically-supported standards for dispensing Subsys by doing so when it knew or should have known that Mrs. Munson did not have cancer pain and by dispensing Subsys in an initial dosage of 200 mcg.

89.   Linden Care, then (within a short period of time from the initial prescription) improperly dispensed increasingly larger doses of Subsys to Mrs. Munson.

90.   While Mrs. Munson continued to receive prescriptions for Subsys, in addition to other narcotics, Linden Care continued to accept the prescriptions and dispensed the medications to Mrs. Munson's home via Federal Express and never questioned the amount prescribed or the diagnosis indicated.

91.   Despite Defendants' knowledge of Subsys' addictive nature, Mrs. Munson continued to be prescribed, sold, and dispensed Subsys over the course of four years.

92.     Upon information and belief, all IPM Subsys prescriptions were monitored by Insys agents and/or employees who would actively encourage increasing prescriptions regardless of whether the prescriptions were warranted or not.

93.     Despite being notified directly by Mrs. Munson of the adverse health effects she was experiencing from Subsys (and other drugs being prescribed at the same time), she continued to receive Subsys the entire time she was under the care of IPM.

94.     As part of the TIRF-REMS program, healthcare professionals prescribing Subsys, including Dr. Florete and other Subsys-prescribing physicians at IPM, were required to submit a Patient-Prescriber Agreement Form attesting that "Subsys was only being prescribed for the management of breakthrough pain in patients with cancer, who were already receiving and who were already tolerant to, around the clock opioid therapy for their underlying persistent cancer pain." Again, Plaintiffs allege this fact as evidence of the healthcare professionals' knowledge, and not for the purpose of stating a cause of action based on a violation of federal law or regulations.

95.     This specific indication for Subsys should have been fully disclosed to Mrs. Munson before it was prescribed.

96.     Defendants recklessly, wantonly, and negligently disregarded the duties of care owed Mrs. Munson.

97.     More specifically, Mrs. Munson received dangerous amounts of Subsys in combination with other narcotics without any medical justification.

98.     In effect ignoring Mrs. Munson's complaints, her treatment at IPM continued to include Subsys, which Linden Care continued to deliver, and Insys continued to encourage. As a

direct and proximate result of these inappropriate and unreasonable actions by Defendants, Plaintiffs suffered harms and losses more fully described below.

## COUNT I
### Civil Conspiracy Against Insys

99.     Paragraphs 1 through 98 are realleged.

100.    **Conspiracy Between Two or More Parties.** Insys acted in concert with Linden Care for the purpose of reaping individual financial benefits by increasing Subsys sales, regardless of whether a patient's treatment plan should include such aggressive and potentially deadly treatment.

101.    **Underlying Torts.** Dr. Florete and all other Subsys-prescribing physicians at IPM ensured patients like Mrs. Munson were continually prescribed Subsys in increasing amounts, despite the fact that her condition would not benefit from the use of this deadly and addictive drug. Doing so violated the physicians' duty of care owed to the patient, as well as the fiduciary relationship between the physicians and the patient.

102.    Linden Care overlooked the improprieties in the prescriptions, including starting dosage amount and listed drug indications, in furtherance of the conspiracy.

103.    Insys rewarded these unlawful activities by providing Linden Care, IPM, Dr. Florete, and other Subsys-prescribing physicians at IPM direct financial benefits from the increased Subsys sales.

104.    **Peculiar Power of Coercion.** In addition, or in the alternative to, the underlying torts, Insys and Linden Care had a peculiar power of coercion by virtue of their combination; working together, Insys and Linden Care had the trust Mrs. Munson placed in her physicians, combined with the market presence and power to secure reimbursement for Subsys from Plaintiffs'

insurers.  As a result of their peculiar power of coercion, Insys and Linden Care's civil conspiracy is an independent tort in and of itself.

105.    **Legal Causation.**    The conspiracy described above directly and proximately caused the injuries at issue in this lawsuit, in that it directly and in natural and continuous sequence produced or contributed substantially to Plaintiffs' injuries.

106.    **Damages of Mrs. Munson.**    As a direct and proximate result of the foregoing negligence, Mrs. Munson suffered permanent and painful injuries, including but not limited to:

      a.   past and future mental anguish;

      b.   past and future physical pain and suffering;

      c.   future life care expenses;

      d.   past and future medical and health care expenses;

      e.   past and future loss of enjoyment of life;

      f.   loss of earning or earning capacity; and

      g.   loss of consortium.

107.    **Damages of Mr. Munson.**    As a direct and proximate result of the foregoing negligence, Mr. Munson, as the husband of Mrs. Munson, suffered loss of consortium.  He is therefore entitled to an award of damages to compensate him for the loss of the society, comfort, companionship, and support of his wife.

**WHEREFORE**, Plaintiffs respectfully pray for judgment against all Insys for compensatory damages, costs, interest as allowed by law, and for such other relief as the Court deems just and demands a trial by jury on all issues so triable as a matter of right.

## COUNT II
## Civil Conspiracy Against Linden Care

108.    Paragraphs 1 through 107 are realleged.

17

109.   **Conspiracy Between Two or More Parties.**  Linden Care acted in concert with Insys for the purpose of reaping individual financial benefits by increasing Subsys sales, regardless of whether a patient's treatment plan should include such aggressive and potentially deadly treatment.

110.   **Underlying Torts.**  Dr. Florete and all other Subsys-prescribing physicians at IPM ensured patients like Mrs. Munson were continually prescribed Subsys in increasing amounts, despite the fact that her condition would not benefit from the use of this deadly and addictive drug. Doing so violated the physicians' duty of care owed to the patient, as well as the fiduciary relationship between the physicians and the patient.

111.   Linden Care overlooked the improprieties in the prescriptions, including starting dosage amount and listed drug indications, in furtherance of the conspiracy.

112.   Insys rewarded these unlawful activities by providing Linden Care, IPM, Dr. Florete, and other Subsys-prescribing physicians at IPM direct financial benefits from the increased Subsys sales.

113.   **Peculiar Power of Coercion.**  In addition, or in the alternative to, the underlying torts, Linden Care and Insys had a peculiar power of coercion by virtue of their combination; working together, Linden Care and Insys had the trust Mrs. Munson placed in her physicians, combined with the market presence and power to secure reimbursement for Subsys from Plaintiffs' insurers.  As a result of their peculiar power of coercion, Linden Care and Insys's civil conspiracy is an independent tort in and of itself.

114.   **Legal Causation.**  The conspiracy described above directly and proximately caused the injuries at issue in this lawsuit, in that it directly and in natural and continuous sequence produced or contributed substantially to Plaintiffs' injuries.

115.   **Damages of Mrs. Munson.**  As a direct and proximate result of the foregoing negligence, Mrs. Munson suffered permanent and painful injuries, including but not limited to:

    a.   past and future mental anguish;

    b.   past and future physical pain and suffering;

    c.   future life care expenses;

    d.   past and future medical and health care expenses;

    e.   past and future loss of enjoyment of life;

    f.   loss of earning or earning capacity; and

    g.   loss of consortium.

116.   **Damages of Mr. Munson.**  As a direct and proximate result of the foregoing negligence, Mr. Munson, as the husband of Mrs. Munson, suffered loss of consortium.  He is therefore entitled to an award of damages to compensate him for the loss of the society, comfort, companionship, and support of his wife.

**WHEREFORE,** Plaintiffs respectfully pray for judgment against all Insys for compensatory damages, costs, interest as allowed by law, and for such other relief as the Court deems just and demands a trial by jury on all issues so triable as a matter of right.

## COUNT III
### Pharmaceutical Negligence Against Linden Care

117.   Paragraphs 1 through 116 are realleged.

118.   At all times relevant hereto, Linden Care and its agents and/or employees had a duty to use due and proper care in filing Mrs. Munson's prescriptions.

119.   **Duty.**  Linden Care and its agents and/or employees undertook the duty to render professional and routine pharmacological care to Mrs. Munson in accordance with the prevailing

professional standards of care for pharmacists and pharmacological entities in the national community.

120. While Mrs. Munson received medications from Linden Care by and through its agents and/or employees, Linden Care and its agents and/or employees failed to use due and proper care in filling the prescriptions by filling prescriptions which it knew, or should have known, to have been intended for improper uses and the direct result of fraudulent marketing.

121. **Breach.** Linden Care breached its duty of care by:

    a. failing to provide accurate and necessary medical information to Mrs. Munson regarding Subsys side effects, including the extreme danger of addiction and death;

    b. dispensing, providing, and selling Subsys, a powerful, highly addictive, highly dangerous, and lethal drug to Mrs. Munson for off label use when it knew Mrs. Munson did not have any condition for which Subsys was ever intended to be used;

    c. engaging in deceptive and dangerous dispensing, providing, and selling of Subsys to Mrs. Munson knowing that her use of Subsys was inappropriate, highly dangerous, and contraindicated;

    d. failing to ensure that Mrs. Munson received proper Subsys package inserts and warnings that should have been provided to her when she received it;

    e. failing to ensure that Mrs. Munson was properly being prescribed Subsys;

    f. failing to ensure proper pharmacy policies, procedures, and guidelines were in place, or if such policies, procedures, and guidelines were in place, failing to ensure pharmacists or pharmacy technicians followed the policies, procedures, and guidelines;

    g. failing to have proper checks and balances in place to ensure that medical providers' prescriptions were appropriate;

    h. knowing, or failing to know when it should have known, that it was regularly filling and dispensing Subsys prescriptions for unapproved indications, including Mrs. Munson's prescriptions, which subjected her to serious risk of harm and death; and

    i.   failing to train, oversee, and manage its employees regarding the proper and safe dispensing of Subsys to patients throughout the country, including Mrs. Munson; and

    j.   otherwise failing to act as a reasonably prudent pharmacy or to exercise reasonable care while providing professional pharmacological services, including when distributing Subsys.

122.   **Legal Causation.**  The negligence described above directly and proximately caused the injuries at issue in this lawsuit, in that it directly and in natural and continuous sequence produced or contributed substantially to Plaintiffs' injuries.

123.   **Damages of Mrs. Munson.**  As a direct and proximate result of the foregoing negligence, Mrs. Munson suffered permanent and painful injuries, including but not limited to:

    a.   past and future mental anguish;

    b.   past and future physical pain and suffering;

    c.   future life care expenses;

    d.   past and future medical and health care expenses;

    e.   past and future loss of enjoyment of life;

    f.   loss of earning or earning capacity; and

    g.   loss of consortium.

124.   **Damages of Mr. Munson.**  As a direct and proximate result of the foregoing negligence, Mr. Munson, as the husband of Mrs. Munson, suffered loss of consortium. He is therefore entitled to an award of damages to compensate him for the loss of the society, comfort, companionship, and support of his wife.

**WHEREFORE,** Plaintiffs respectfully pray for judgment against Linden Care for compensatory damages, costs, interest as allowed by law, and for such other relief as the Court deems just and demands a trial by jury on all issues so triable as a matter of right.

## COUNT IV
## Negligence Against Insys

125.   Paragraphs 1 through 124 are realleged.

126.   **Duty.**   At all times relevant hereto, Insys and it agents and/or employees owed duties to Mrs. Munson specifically and generally to all patients receiving prescription medications it manufactured.

127.   **Breach.**   Insys breached its duty of care by:

    a.   failing to provide accurate and necessary information to Mrs. Munson regarding Subsys side effects, including the extreme danger of addiction and death, when taken for the treatment of conditions other than breakthrough cancer pain;

    b.   pre-populating forms to fraudulently obtain payment from insurers for the improper and medically-unsupported prescriptions;

    c.   marketing, promoting, and encouraging Subsys to Mrs. Munson without regard to the extreme risk Subsys posed to Mrs. Munson's health and well-being;

    d.   ignoring the medically-approved and safe dosages for Subsys, and instead promoting and encouraging a much higher and more dangerous "effective dose" solely to maximize profits and commissions;

    e.   mandating and encouraging its salespersons to interfere with the doctor/patient relationship by personally meeting with patients, and making material misrepresentations regarding the sole indication for Subsys and the true risks associated with the drug;

    f.   illegally paying kickbacks and other financial incentives to physicians in its Speakers Program as a means of incentivizing providers to prescribe Subsys for the treatment of conditions other than breakthrough cancer pain;

    g.   fraudulently assisting patients, physicians, and pharmacies in obtaining preauthorization and approval from Medicare, Medicaid, and insurance companies for payment of Subsys by misrepresenting the patient's diagnosis;

    h.   failing to warn Mrs. Munson of the true risks of Subsys when taken for the treatment of conditions other than breakthrough cancer pain; and

    i.   otherwise failing to act as a reasonably prudent pharmaceutical manufacturer and distributor, or to exercise due care while manufacturing, distributing, marketing, and promoting Subsys.

128.    As a proximate result of the negligence, carelessness, gross negligence, recklessness, and departures from duties owed to Plaintiffs by Insys and it agents and/or employees, Plaintiffs have suffered permanent and painful injuries, including but not limited to:

      a.  past and future mental anguish;

      b.  past and future physical pain and suffering;

      c.  future life care expenses;

      d.  past and future permanent physical impairment;

      e.  past and future medical and health care expenses;

      f.  past and future loss of enjoyment of life;

      g.  loss of earnings or earning capacity; and

      h.  loss of consortium.

129.    **Legal Causation.**   The negligence described above directly and proximately caused the injuries at issue in this lawsuit, in that it directly and in natural and continuous sequence produced or contributed substantially to Plaintiffs' injuries.

130.    **Damages of Mrs. Munson.**   As a direct and proximate result of the foregoing negligence, Mrs. Munson suffered permanent and painful injuries, including but not limited to:

      a.  past and future mental anguish;

      b.  past and future physical pain and suffering;

      c.  future life care expenses;

      d.  past and future medical and health care expenses;

      e.  past and future loss of enjoyment of life;

      f.  loss of earning or earning capacity; and

      g.  loss of consortium.

131. **Damages of Mr. Munson.** As a direct and proximate result of the foregoing negligence, Mr. Munson, as the husband of Mrs. Munson, suffered loss of consortium. He is therefore entitled to an award of damages to compensate him for the loss of the society, comfort, companionship, and support of his wife

132. Insys is not immunized under the learned intermediary doctrine by virtue of its reckless and illegal promotion of Subsys to medical providers, including Dr. Florete and other Subsys-prescribing physicians at IPM, through its fake "Speakers Program" and other methods of funneling kickbacks to medical providers to induce them to prescribe Subsys regardless of a patient's need.

133. By insinuating itself into the doctor-patient relationship, Insys obviated any claim it could make that the doctor acted as an independent intermediary in prescribing Subsys.

**WHEREFORE**, Plaintiffs respectfully pray for judgment against Insys for compensatory damages, costs, interest as allowed by law, and for such other relief as the Court deems just and demands a trial by jury on all issues so triable as a matter of right.

## COUNT V
### Aiding and Abetting Against Insys

134. Paragraphs 1 through 133 are realleged.

135. By funneling kickbacks to Dr. Florete and other Subsys-prescribing physicians at IPM who were willing to market and prescribe Subsys for the treatment of conditions other than breakthrough cancer pain in exchange for financial benefit, Insys aided and abetted Dr. Florete and other Subsys-prescribing physicians at IPM in engaging in a pattern of criminal activity, including providing Subsys when it was medically unnecessary in violation of Fla. Stat. § 893.13(7)(b) and prescribing Subsys solely for their financial benefit in violation of § 893.13(8)(a)(1).

136.    As a direct and proximate result of Insys's aiding and abetting of wrongful actions,

Plaintiffs suffered permanent and painful injuries, including but not limited to:

    a.   past and future mental anguish;

    b.   past and future physical pain and suffering;

    c.   future life care expenses;

    d.   past and future permanent physical impairment;

    e.   past and future medical and health care expenses;

    f.   past and future loss of enjoyment of life;

    g.   loss of earnings or earning capacity; and

    h.   loss of consortium.

137.    Plaintiffs are entitled to recover actual, consequential, and punitive damages from

Insys in an amount to be determined by a jury at trial.

**WHEREFORE**, Plaintiffs respectfully pray for judgment against Insys for compensatory

damages, costs, interest as allowed by law, and for such other relief as the Court deems just and

demands a trial by jury on all issues so triable as a matter of right.

### COUNT VI
### Aiding and Abetting Against Linden Care

138.    Paragraphs 1 through 137 are realleged.

139.    By filling Subsys prescriptions written by Dr. Florete and other Subsys-prescribing

physicians at IPM for the treatment of conditions other than breakthrough cancer pain and willfully

ignoring the medically-supported initial dosage and titration instructions, Linden Care aided and

abetted Dr. Florete and other Subsys-prescribing physicians at IPM in engaging in a pattern of

criminal activity, including providing Subsys when it was medically unnecessary in violation of

Fla. Stat. § 893.13(7)(b) and prescribing Subsys solely for their financial benefit in violation of § 893.13(8)(a)(1).

140.    As a direct and proximate result of Linden Care's aiding and abetting of wrongful actions, Plaintiffs suffered permanent and painful injuries, including but not limited to:

    a.   past and future mental anguish;

    b.   past and future physical pain and suffering;

    c.   future life care expenses;

    d.   past and future permanent physical impairment;

    e.   past and future medical and health care expenses;

    f.   past and future loss of enjoyment of life;

    g.   loss of earnings or earning capacity; and

    h.   loss of consortium.

    i.    Plaintiffs are entitled to recover actual, consequential, and punitive damages from Insys in an amount to be determined by a jury at trial.

**WHEREFORE**, Plaintiffs respectfully pray for judgment against Linden Care for compensatory damages, costs, interest as allowed by law, and for such other relief as the Court deems just and demands a trial by jury on all issues so triable as a matter of right.

/s/  J. CLANCEY BOUNDS
J. CLANCEY BOUNDS
FBN:  0981631
BOUNDS LAW GROUP
1751 N. Park Avenue
Maitland, FL 32751
Tel:  (407) 644-5151
Fax:  (407) 644-4566
cbounds@boundslawgroup.com
alice@boundslawgroup.com
service@boundslawgroup.com
*Counsel for Plaintiffs*